UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | NO. 3:19CR126(KAD) |
| v. | : | NO. 3:10CR206(KAD) |
| GARY JOSEPH GRAVELLE | : | |
| a.k.a "Roland Prejean" | | October 6, 2020 |

GOVERNMENT'S
MEMORANDUM IN AID OF SENTENCING

The Government respectfully submits this memorandum in response to the defendant

Gary Joseph Gravelle's sentencing memorandum (docket no. "Doc." 60) and to assist the Court

in sentencing the defendant for threatening to kill and/or injure public officials and private

citizens and to blow up and/or damage public and private buildings as well as for violating his

supervised release while under the Court's supervision for previously committing the same

offenses.   The defendant is scheduled to be sentenced on October 13, 2020.

The defendant seeks an effective sentence of 63 months in prison for both his new

threatening conduct and the supervised release violation, no fine, and a substantial term of

supervised release.   Also he seeks the Court's recommendation that he serve his prison sentence

at a Federal Medical Facility capable of meeting his psychiatric care.   Def. Sent. Mem. at 8-9.

For the reasons explained below, the Government respectfully submits the cases warrant

a prison sentence within or near the 77- to 96-month Guideline range, a three-year period of

supervised release, and a $700 special assessment as well as an additional period of

imprisonment for breaching the Court's trust by committing new and similar felony offenses

provided the combined sentence does not exceed 120 months.   The Government agrees that the

defendant will benefit from continued mental health treatment while in prison and once released

and that no fine is warranted because he has no funds and has not held a job since 1998.

I.   Background

In early September 2010, the defendant, then known as Roland Prejean, embarked on a cross-country road trip, during which he wrote and mailed a myriad of letters threatening to kill and/or injure both public officials and private citizens, as well as to blow up various public buildings. Many of the letters were filled with racist and anti-Semitic rants, and included threats of dismemberment, cannibalization, and other horrific crimes designed to wreak terror in the minds of the letters' recipients.   He was arrested in North Dakota after several days of mailing these hate-filled letters.   For the ensuing several months, he continued to write even more letters from jail, often promising retaliation for those who had reported his initial letters. When the jail tried to put restrictions on his mail privileges, the defendant simply avoided them by writing "legal mail" on the front of his envelope, or by using the identity of another inmate who did not have such restrictions. In all, the defendant mailed well over 50 threatening letters.

On September 20, 2010, the U.S. District of Connecticut issued a criminal complaint and arrest warrant for the defendant and he was arrested and presented in the District of North Dakota on September 22, 2010.   On October 6, 2010, a federal grand jury returned a five-count indictment charging him with one count of willfully making threats, through the use of the mail, to kill, injure, or intimidate any individual or unlawfully to damage or destroy any building by means of an explosive, in violation of 18 U.S.C. § 844(e) and four counts of mailing threatening communications, in violation of 18 U.S.C. 876(c).   *United States v. Roland Prejean*, No. 3:10CR206(WWE)(or referred to as the "2010 case").   He was detained pretrial.

On January 10, 2013, the defendant, without a plea agreement, pleaded guilty to the five-count indictment.   On July 19, 2013, the Court sentenced him to 70 months in prison, followed

2

by a three-year term of supervised release.

On November 20, 2015, the defendant was released from prison and began serving his term of supervised release under the supervision of the United States Probation Office in Connecticut.

On September 4, 2018, the defendant had approximately two months remaining before he completed his three-year supervised release term on November 20, 2018.   According to the Probation Office, he was working well with his supervising Officer and overall complying with the terms of his supervision, including receiving mental health treatment.

II.   Facts and Circumstances of the Defendant's Conduct

The defendant's criminal conduct primarily with respect to the seven counts to which he pleaded guilty and gave rise to the supervised release violation is substantially restated in the parties' plea agreement (Doc. 36 at 13-16) and is recounted below.   The Presentence Report ("PSR")(Doc. 41 ¶¶ 8-36) details those counts and other relevant conduct.

A.   Criminal Conduct

On September 4 and 5, 2018, through the use of the U.S. mail, electronic mail, and telephone, the defendant threatened to kill, injure, and intimidate people and explode property in Connecticut and elsewhere.   Those threatened include federal judges, federal probation officers, social workers, U.S. Bureau of Prisons employees, First Bristol Federal Credit Union, the Burlington Airport in Vermont, the New Haven chapter of the National Association for the Advancement of Colored People, Congregation Adath Israel in Middletown, the Islamic Center of New London, Old Saybrook Center, and the current President of the United States.   The quoted words in the communications below are unedited and are as the defendant wrote them.

3

Count One – Fellowship House

On September 4, 2018 at 6:54 p.m., the defendant sent a threatening email to the Program Manager of the Fellowship House, located at 441 Elm Street in New Haven, Connecticut.   He sent the message from a return email address: "americanknightsofanarchy@gmail.com," an account he had set up using the name Theodore Cowell, which was serial killer Ted Bundy's real name. The email contains threatening language, including the following: "Are u ready to die? There's a high yield explosive device hidden in the Crest building. Outside, waiting, are 4 AKA assassins carrying AK 47s. You are all gonna die…" After reading the email, the Program Manager immediately called the New Haven Police Department and notified her supervisor. The email caused major alarm and upset. The Fellowship House building was evacuated, displacing approximately 4-5 staff members and 12 patients who were receiving care and treatment, and funds were expended to respond to the offense.

Count Two – U.S. Probation Office and Officers

On September 4, 2018 at 8:00 p.m., the defendant sent a threatening email to a Supervising U.S. Probation Officer the defendant knew from being supervised by the U.S. Probation Office.   The sender used the name Muhammad Farakahn with an email address allahalakamsalaambinlade@gmail.com. The email contains threatening and offensive language concerning a Supervising Probation Officer and the Probation Officer supervising him.   The email includes the following: "We are coming for all you fed scum!!! We are the American Knights of Anarchy.[1]  There are high yield C4 explosive devices hidden in your Hartford

---

[1] The defendant routinely referenced American Knights of Anarchy or his militia in his threatening communications presumably to scare the recipients into believing a group of actors was threatening them.   Law enforcement later did not identify anyone assisting or acting in concert with him.

building [referring to 450 Main Street, Hartford, Connecticut].   Remote detonator. PETN-based detonating cord. Bacillus anthracis…. M24s are scoping you now. We declare war on you."   As a result, of this email together with a white powder letter the defendant sent to the U.S. Probation Office at 450 Main Street, Hartford, Connecticut, the office was shut down, evacuated, employees were subject to decontamination procedures, and funds were expended to clean up, decontaminate, or otherwise respond to the offense.

Count Five – Federal Detention Center SeaTac

On September 4, 2018 at 11:35 p.m., the defendant sent a threatening email to the U.S. Bureau of Prisons email address SET/ExecAssistant@bop.gov from email address gravellejosephgary@gmail.com.   The addressee is the Federal Detention Center SeaTac located at 2425 South 200th Street, Seattle, Washington.   He wrote, "We are the American Knights of Anarchy. We declare war against the vile corrupt US government. We will murder any and all federal law enforcement when and where we find you scum. AKA assassins will murder BOP staff from 800meters using an M24 sniper rifle. We planted high yield c4 explosive devices in the Sea Tac offices. You will all die."   As a result of the email, the prison followed its bomb threat protocol, including securing its perimeter, causing disruption to prisoners and the operation of prison, and funds were expended to respond to the offense.

Count Six – Persons and Yale University

On September 5, 2018 at 12:04 a.m., the defendant sent a threatening email to multiple recipients at Yale, including a treatment provider at Connecticut Mental Health Center, 34 Park Street, New Haven, Connecticut.   The defendant received mental health treatment at the Connecticut Mental Health Center.   The email was from email account garyjosephgravelle@gmail.com.   He wrote: "We are the American Knights of Anarchy. We

5

declare war against the vile corrupt Yale university. We will murder any and all Yale scum when and where we find you scum. AKA assassins will murder you from 800 meters using an M24 sniper rifle.    We planted high yield c4 explosive devices in Yale offices. You will all die." The email ends, "I am Gary Joseph Gravelle. [XXXXX]2945. [XXXX]1967. I am the Commander of the AKA quick strike forces."   The numbers are references to Gravel's Social Security number and date of birth.   The email caused major alarm and upset. The building was evacuated, displacing staff members and patients who were receiving care and treatment, and funds were expended to respond to the offense.

### Count Ten – U.S. District Court Judge

On September 5, 2018, a letter containing an unknown white powder and threatening communication was delivered to U.S. District Court Judge Vanessa Bryant. The letter, postmarked September 4, 2018, was addressed to "Vanessa L. Bryant, U.S. District Judge, 450 Main Street, Hartford, CT 06103."   The return address is "Bob Matthews, LCSW   882 Glacier Way, Southington, CT 06489."   In the letter, the defendant wrote, "There are 6 high-yield explosive devices hidden at 450 Main St. in Harford, CT" and "We declare WAR on the United States District Court-Hartford, CT. You will all die for crimes against humanity and the A.K.A. Our assassins are very near you." The letter also contains a threat that Anthrax has been placed somewhere in the 450 Main Street building: "Anthrax is an acute infectious disease caused by the spore-forming bacterium Bacillus anthracis a category A agent."   As a result of the letter, the Judge's chambers were evacuated and closed for at least three days, court personnel were subject to decontamination procedures, and funds were expended to clean up, decontaminate, or otherwise respond to the offense.

Count Thirteen - NAACP

On September 6, 2018, the staff at the NAACP office in New Haven received a white powder letter from the defendant.   The letter, dated September 2, 2018 and postmarked September 4, 2018, is addressed to "N.A.A.C.P. – New Haven, 545 Whalley Ave., New Haven, CT 06511."     The return address is "Ted Cowell, APRN, 21 Irving st., Bristol, CT 06010."   The letter contains racially offensive language and threats of "WAR" by the American Knights of Anarchy on African Americans and other groups.   Specifically, the letter provided "We declare WAR on all niggers, monkeys, spear-chuckers, toads, flat heads + mud people! We are hunting you, and we won't stop until all mud races are annihilated!" The letter also contains a description of a firearm and Anthrax: "The bolt-action 7.62 x 51 mm M24 is capable of 0.5 MOA accuracy + maximal effective range of 800 meters. **Anthrax **is an acute infectious disease caused by bacterium. Breathe Deep Bitch—And Die." The letter also contains the words "We Bleed You all die!"   The letter has dark smears with a full handprint on it.

Count Sixteen – U.S. President

On or about September 4, 2018, the defendant mailed a threatening white powder letter to President Donald Trump.   The letter, postmarked September 4, 2018, is addressed to "The Honorable Donald Trump, 1600 Pennsylvania Ave, NW, Washington, DC 20500."   In the letter, the defendant states, "You Die," "Bacillus anthracis," and "I, Gary Gravelle, [XXXXX]2945, as a faithful soldier of the AKA, am coming to KILL Donald Trump …."     The number reference is to his Social Security number.   The letter is signed "Love, Gary Gravelle" and has the number "10750-059," which is his U.S. Marshal Service prisoner number.   The letter has dark smears like fingers on it.

B.   The Defendant's Arrest and Statements

Later on September 5, 2018, Deputy U.S. Marshals arrested the defendant on a federal arrest warrant for violating the terms of his supervised release.   The DUSMs took him to the New Britain Hospital for evaluation and he was discharged.   DUSMS advised the defendant of his Miranda Rights and he voluntarily waived them.   He spoke with the DUSMs and provided the following:   He admitted sending threatening emails and sending approximately 50 letters that had baking soda and his blood in them.   He was suicidal, but did not have the guts to carry it out himself.   He wanted to commit suicide at his parents' grave.   He hates himself.   He wanted to go back to prison so he could die in prison.   His intentions were to commit so many crimes that he would not get out of prison.   The defendant explained that he does not like to be around people and the apartment complex in which he was residing housed so many people who were always hanging around.   When sending the letters he used various aliases as well as his name as the return sender.   He knows what he did was wrong and knew he would get caught. He handwrote all of the letters and his fingerprints are all over them. Most of the letters had the return address of 2l Irving Street, Bristol, CT.   The list included U.S. District Judge Vanessa L. Bryant, Hartford, the US Probation Office, the NAACP in Connecticut, and the President of the United States.   He further explained that he had mailed some of the letters on August 31, 2018 from a U.S. Post Office mailbox in New Haven and more letters on September 4, 2018 from a U.S. Post Office mailbox in Southington, Connecticut.   The defendant said that on the evening of September 4, 2018 he made a threatening telephone call to U.S. District Judge Bryant's office line containing bad stuff about killing her and made a threatening telephone call to a treatment provider at Connecticut Mental Health Center.   He further said he sent e-mails to a large number

8

of people, including: a U.S. Probation Officer, CREST Program [Fellowship House] located at Elm Street, New Haven, a treatment provider at Connecticut Mental Health Center.

### C.   Supervised Release Violation

While under supervision in the 2010 case, the defendant violated the condition of his supervised release that he not violate federal law while under supervision.   He admitted that he did this by committing the offenses described above.   PSR ¶ 36, Plea Agreement at 3.

III.   Sentencing Guidelines

### A.   Plea Agreement

By plea agreement, the parties entered into a Guideline Stipulation in which they agreed upon the calculation of the Sentencing Guidelines.   Plea Agreement at 7.   The defendant's base offense level under U.S.S.G. § 2A6.1 for Count Thirteen is 12.   Three levels are added under § 3A1.1(a) because the defendant intentionally selected the victim and any property as the object of the offense of conviction because of the actual or perceived race or color, resulting in an adjusted offense level of 15.

Under the multiple count analysis of U.S.S.G. § 3D1.4, Counts One, Two, Six, Ten, and Sixteen each receive one unit because they are equally serious or one to four levels less serious to the offense with the highest adjusted offense level (Counts Two and Ten) of 22.   Counts Five and Thirteen each receive a half of a unit because they are five to eight levels less serious than the offense with the highest adjusted offense level of 22.   A total of six units results in an additional five levels being added to the highest of the adjusted offense level of 22, resulting in a combined adjusted offense level of 27.   Three levels are subtracted under U.S.S.G. § 3E1.1 for acceptance of responsibility, as noted above, resulting in a total offense level of 24.

Based on an initial assessment, the parties agree that the defendant falls within Criminal History Category IV.   The parties reserve the right to recalculate the defendant's Criminal History Category and corresponding sentencing ranges if this initial assessment proves inaccurate.   *Id*. at 7,

A total offense level 24, assuming a Criminal History Category IV, would result in a range of 77 to 96 months of imprisonment (sentencing table) and a fine range of $20,000 to $200,000, U.S.S.G. § 5E1.2(c)(3).

As for the defendant's supervised release violation in the 2010 case, as explained above, he committed the offenses charged in the Indictment while under supervision.   Under U.S.S.G. § 7B1.1, the threatening conduct is a Grade A violation.   The defendant's Criminal History Category at the time of the 2010 case was IV.   Therefore, the applicable Guideline range is 24 months, the bottom of the 24- to 30-month range because the statutorily authorized maximum term is two years.   U.S.S.G. §§ 7B1.4(a) and 7B1.4(b).

As part of the plea agreement, the defendant reserved his rights to seek a downward departure or a lower non-Guidelines sentence.   The Government does not intend to seek an upward departure or non-Guideline sentence greater than 120 months, the top of the combined applicable Guideline range for the new offenses and the supervised release violation.   *Id.* As explained to the defendant at the time of his guilty plea, the plea agreement provided "that the Court is not bound by this agreement on the Guideline ranges specified" above.   *Id.*

Also as part of the plea agreement, the defendant agreed to waive his right to appeal or collaterally challenge his conviction if his sentence did not does not exceed 101 months of imprisonment, a three-year term of supervised release, a $20,000 fine if the Court finds he is financially capable to pay it, and a $700 special assessment, even if the Court imposes such a

10

sentence based on an analysis different from that specified above.   Similarly, the Government will not appeal a combined sentence of 120 months or greater for new offenses and supervised release violation(s).   *Id.* at 9. This waiver does not reflect any position by the Government as to what an appropriate sentence should be in this case.

    B.   <u>Presentence Report</u>

The Sentencing Guidelines calculation in the PSR, like in the plea agreement, determined a total offense level 24.   PSR ¶¶ 90, 132.   The defendant has an extensive criminal history. The PSR found the defendant to be a Criminal History Category V, rather than IV as the parties calculated in their plea agreement.   PSR ¶¶ 3, 107, 133.   The additional criminal history points not considered by the parties when calculating the defendant's Criminal History Category were the two convictions at paragraphs 103 and 104 of the PSR concerning State convictions for threatening conduct in 2010 that was part of his federal conviction in the 2010 case.   Of note, is that the defendant's guilty pleas to State threatening charges were in January and February 2015 and the sentencings (conditional discharge/suspended and 6 months' concurrent) were imposed in March 2015 while the defendant was still in federal prison on the 2010 case.   The 3 criminal history points assigned to the two State convictions were not considered because they were viewed as duplicative of the federal conviction in the 2010 case.   Under U.S.S.G. § 4A1.2(a)(2) the two State offenses should be counted.   PSR Addendum (Doc. 41-1).   At an offense level total 24 and Criminal History Category V, the PSR calculates the defendant's Guideline range to be 92 to 115 months' imprisonment, PSR ¶ 132, and the fine range is $20,000 to $20,000, PSR ¶ 142.

IV.   Discussion

A.   Determining an Appropriate Sentence

A sentencing judge is required to "(1) calculate[] the relevant Guidelines range, including any applicable departure under the Guidelines system; (2) consider[] the calculated Guidelines range, along with the other § 3553(a) factors; and (3) impose[] a reasonable sentence."   *United States v. Fernandez*, 443 F.3d 19, 26 (2d Cir. 2006); *United States v. Crosby*, 397 F.3d 103, 113 (2d Cir. 2005).   Because the Guidelines are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions," *Gall*, 552 U.S. at 46, district courts must treat the Guidelines as the "starting point and the initial benchmark" in sentencing proceedings.   *Gall v. United States*, 552 U.S. 38, 49 (2007); *Kimbrough v. United States*, 552 U.S. 85, 107 (2007).   The Second Circuit has "recognize[d] that in the overwhelming majority of cases, a Guidelines sentence will fall comfortably within the broad range of sentences that would be reasonable in the particular circumstances." *Fernandez*, 443 F.3d at 27; *see also Kimbrough*, 552 U.S. at 89 ("We have accordingly recognized that, in the ordinary case, the Commission's recommendation of a sentencing range will 'reflect a rough approximation of sentences that might achieve § 3553(a)'s objectives.'") (*quoting Rita v. United States*, 551 U.S. 338, 350 (2007)).   In considering whether to depart from the Guidelines or impose a non-Guideline sentence, the Court may consider policy statements concerning departures.   *See United States v. Selioutsky,* 409 F.3d 114, 118 (2d Cir.2005) ("[T]he sentencing judge must consider the factors set forth in 18 U.S.C. § 3553(a), including the applicable Guidelines range and available departure authority.   The sentencing judge may then impose either a Guidelines sentence or a non-Guidelines sentence." (citation omitted)); *United States v. Canova,* 412 F.3d 331, 358 n. 28 (2d Cir.2005) ("We ... reiterate our

12

observation in *Crosby* that, after *Booker,* a district judge can fairly consider policy statements concerning departures and fairly decide to impose a non-Guidelines sentence without 'definitively resolv[ing]' close questions regarding the 'precise meaning or application of a [departure] policy statement.' " (alterations in original) (quoting *Crosby,* 397 F.3d at 112)).

The § 3553(a) factors include: (1) "the nature and circumstances of the offense and history and characteristics of the defendant;" (2) the need for the sentence to serve various goals of the criminal justice system, including (a) "to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment," (b) to accomplish specific and general deterrence, (c) to protect the public from the defendant, and (d) "to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;" (3) the kinds of sentences available; (4) the sentencing range set forth in the guidelines; (5) policy statements issued by the Sentencing Commission; (6) the need to avoid unwarranted sentencing disparities; and (7) the need to provide restitution to victims. *See* 18 U.S.C. § 3553(a).

The Court may impose the sentences for the new offenses and supervised release violation concurrently or consecutively. In deciding whether to impose the sentenced concurrently or consecutively to one another, 18 U.S.C. § 5384(b) provides that the Court is to consider the factors of § 3553(a) as to each offense.

B.   A Significant Prison Sentence is Warranted

The defendant acknowledges he committed serious offenses that warrant a serious sentence. Def. Sent. Mem. at 6, 8. He seeks a 63-month prison sentence based on a two-level downward departure or variance from the parties' calculated range of 77 to 96 to Guideline range 63 to 78 (total offense level 22 and Criminal History Category IV). *Id*. at 8. Also, he asks the

13

Court to run any additional prison time for his violating supervision concurrently with the sentence for the new offenses.   *Id.*   His request appears to be based on the following three reasons: (1) departure based on *United States v. Fernandez*, 844 F.2d 1138 (2d Cir. 1989), from Criminal History Category V to IV to give effect to the parties' plea agreement that miscalculated his Criminal Category as IV (Def. Sent. Mem. at 1); (2) a six-level rather than three-level adjustment under U.S.S.G. § 3A1.2(b) overstates the defendant's conduct because he selected public officials to threaten in order to get help (Def. Sent. Mem. at 2-3); and (3) his mental and emotional condition individually or in combination with other offender characteristics are present to an unusual degree and distinguish the case from the typical cases covered by the Guidelines (§ 5H1.3) and he committed the offenses while suffering from a significantly reduced mental capacity and his significantly reduced mental capacity contributed substantially to the commission of the offenses (§ 5K2.13) (Def. Sent. Mem. at 5-6).

    1.   <u>Criminal History Departure to Category IV</u>

As explained above, the parties in their plea agreement calculated the defendant's Criminal History Category to be a IV because two State offenses were part of the same course of conduct that resulted in the defendant's federal conviction in the 2010 case for which he already received criminal history points.   The PSR properly calculates the Criminal History Category as V. According to the Guidelines Manual, the two State convictions received points under U.S.S.G. § 4A1.2(a)(2) because they were disposed of on separate dates and were not part of the offense conduct or relevant conduct in this case.   PSR ¶¶ 103, 104, Addendum.   *See United States v. Medina*, 734 Fed. Appx. 777, 779 (S.D.N.Y. May 24, 2018)(In November 2007, the United States Sentencing Commission adopted a "bright-line test" in § 4A1.2(a)(2) that provides in the absence of an intervening arrest between offenses, "prior sentences are counted separately unless (A) the

14

sentences resulted from offenses contained in the same charging instrument; or (B) the sentences were imposed on the same day").

The parties' plea agreement specifically provides that "the parties reserve the right to recalculate the defendant's Criminal History Category and corresponding sentencing ranges if this initial assessment proves inaccurate."  Plea Agreement at 7.  The Government is permitted to advocate for a Category V.  The Government requests, however, that the Court give effect to the parties' plea agreement through a departure or variance under the circumstances of this case because the criminal history points for the State convictions for threatening conduct in 2010 are part of his federal conviction in the 2010 case that resulted in 3 criminal history points and the State sentencings (conditional discharge/suspended and 6 months' concurrent) were imposed in March 2015 while the defendant was in federal prison for the 2010 case.  PSR ¶ 148.

    2.   <u>Section 3A1.2(b) Adjustment is Appropriate</u>

The application of the six-level victim related adjustment under U.S.S.G. § 3A1.2(b) in calculating the applicable Sentencing Guidelines is appropriate in this case.  This includes the Probation Officer victims in Count Two (PSR ¶¶ 9, 43) and the District Judge in Count 10 (PSR ¶¶ 18, 49) because the defendant specifically targeted his victims and because he either knew them or he knew the nature of their role in judicial system.  The Guidelines appropriately assign levels based on risks, dangers, and other factors.  Threatening a public official because of the performance of their duties in the judicial system is far consideration for an increased Guideline range and does not provide a basis for the requested departure or variance.

    3.   <u>Consideration of the Defendant's Mental and Emotional Condition</u>

The Court should carefully consider the defendant's mental and emotional condition in determining an appropriate sentence and may wish to consider whether his mental state at the

time of the offense warrants a departure or variance from the applicable Guideline range.

Section 5H1.3 with the Guidelines chapter discussing certain offender characteristics to consider provides:

> Mental and emotional conditions may be relevant in determining whether a departure is warranted, if such conditions, individually or in combination with other offender characteristics, are present to an unusual degree and distinguish the case from the typical cases covered by the guidelines. See also Chapter Five, Part K, Subpart 2 (Other Grounds for Departure).

> In certain cases a downward departure may be appropriate to accomplish a specific treatment purpose. See §5C1.1, Application Note 7. [Consideration for treatment available in other Zones, inapplicable here.]

> Mental and emotional conditions may be relevant in determining the conditions of probation or supervised release; e.g., participation in a mental health program (see §§5B1.3(d)(5) and 5D1.3(d)(5)).

Section 5K2.13 provides that a Court has the authority and may downwardly depart for diminished capacity as follows:

> A downward departure may be warranted if (1) the defendant committed the offense while suffering from a significantly reduced mental capacity; and (2) the significantly reduced mental capacity contributed substantially to the commission of the offense.   Similarly, if a departure is warranted under this policy statement, the extent of the departure should reflect the extent to which the reduced mental capacity contributed to the commission of the offense.

> However, the court may not depart below the applicable guideline range if (1) the significantly reduced mental capacity was caused by the voluntary use of drugs or other intoxicants; (2) the facts and circumstances of the defendant's offense indicate a need to protect the public because the offense involved actual violence or a serious threat of violence; (3) the defendant's criminal history indicates a need to incarcerate the defendant to protect the public; or (4) the defendant has been convicted of an offense under chapter 71, 109A, 110, or 117, of title 18, United States Code [obscenity and sexual offenses].

Application note 1 in the Commentary advises that "'[s]ignificantly reduced mental capacity' means the defendant, although convicted, has a significantly impaired ability to (A) understand the wrongfulness of the behavior comprising the offense or to exercise the power of reason; or

16

(B) control behavior that the defendant knows is wrongful."

A defendant seeking a departure § 5K2.13 departure must establish a reduced mental capacity and a causal connection between that reduced capacity and his committing the offense. *United States v. Piervinanzi*, 23 F.3d 670, 684 (2d Cir. 1994).   Moreover, the Court in considering the policy statement may conclude, based on the defendant's threatening conduct, there exists a need to protect the public because the offense involved a serious threat of violence or the defendant's criminal history indicates a need to incarcerate the defendant to protect the public.

Here, the defendant knew he was engaging in wrongful conduct.   He was convicted in the 2010 case on five counts of sending threatening communications.   When arrested in September 2018 he told law enforcement that his intention was to commit so many crime he would not get out of prison and he knew what he was doing was wrong.   PSR ¶ 26.   The most recent psychiatric evaluation indicates the defendant has a history of exaggerating his mental health systems and has the rational and factual understanding of the nature and consequences of the proceedings against him.   PSR ¶ 127.

In the context of a variance in considering the § 3553(a) factors, the Court may wish to consider that the defendant also wrote and sent letters apologizing for his conduct and expressing a desire to commit suicide.   These letters were sent around the same time he made threatening telephone calls and sent threatening emails and letters, and just two months before his supervision was to end.   PSR ¶¶ 7, 33.

V.   A Significant Sentence is Warranted When Consideration the 18 U.S.C. § 3553(a) Factors

Consideration of the Guidelines and the statutory factors demonstrate that a sentence within the Guidelines range of 77- to 96-month Guideline range along with an additional incremental period

17

of imprisonment for the defendant violating his supervision and breaching the Court's trust is warranted provided the combined sentence does not exceed 120 months.   *See* 18 U.S.C. § 3553(a)(2).

      A.   <u>Seriousness of the Offense, Respect for the Law, and Just Punishment</u>

The defendant engaged in serious crimes over the course of a few days, exposed a wide variety of people to horrific threats and racial insults, and disrupted the administration of several government agencies, a prison, houses of worship, civic organizations, institutions, and public health providers.   The defendant's emails, letters, or telephone calls to civilians and public officials were designed to terrorize and threaten, and in some instances caused substantial disruptions to public agencies, organizations, institutions, and mental health providers.   He acknowledged sending threatening emails and more than 50 letters that had baking soda and his blood on them.   PSR ¶ 26.

While there is no question that the defendant suffers and/or has suffered from mental illnesses, it is worth remembering that, in assessing the seriousness of the crime and its impact on the many victims, the defendant's illness was certainly not known to the victims at the time they received his threatening communications. This includes when the defendant wrote the program manager at the Fellowship House and asked, "Are u ready to die? There's a high yield explosive device hidden in the Crest building. Outside, waiting, are 4 AKA assassins carrying AK 47s. You are all gonna die…" Similarly, when he emailed a U.S. Prison and wrote "We will murder any and all federal law enforcement when and where we find you scum. AKA assassins will murder BOP staff from 800meters using an M24 sniper rifle. We planted high yield c4 explosive devices in the Sea Tac offices. You will all die," the prison personnel did not know the defendant did not mean his threats. Likewise, when a District Judge's chambers received a letter stating "There are 6 high-yield explosive devices hidden at 450 Main St. in Harford, CT" and a threat that Anthrax had been placed somewhere in the 450 Main Street building: "Anthrax is an acute infectious disease caused by the

spore-forming bacterium Bacillus anthracis a category A agent," there was no way to know for the recepients to evaluate the threat level.   Quite the opposite, in fact, law enforcement and public safety responded and in some instances evacuated, closed, and decontaminated people and facilities.   When the defendant threatened to hunt and annihilate African Americans and deploy anthrax, the NAACP rightfully took the threat seriously – again, they did not know about the defendant's circumstances; they only knew the heinous threats that he had sent.   Many of the letters had dark smears like blood with handprints.   The defendant himself told authorities when arrested that he wanted to go back to prison so he could die in prison and his intentions were to commit so many crimes that he would not get out of prison.   PSR ¶ 26.

Fortunately, the defendant did not act out his threats.   Unfortunately, like his conduct in 2010, his letters and emails disrupted the daily lives of many and no doubt seriously frightened their recipients.

B.   Adequate Deterrence

The defendant continued to engage in the same threatening and anti-social behavior as he did in 2010.   Although there is promise the defendant's threatening communication days are behind him, given his history of similar behavior and his statements in this case, specific deterrence is an important consideration.   Based on the most recent psychiatric evaluation and his prior 2010 federal conviction, the defendant was well aware that his conduct was a felony and that he would go to jail for repeatedly threatening others.

C.   Protecting the Public from the Defendant

Protection of the public is of paramount importance in assessing the appropriate sentence in this case.   For many years, unfortunately, the defendant has responded to the stresses of his own life by lashing out at others, typically through threatening letters, although the defendant does have two prior convictions for assault related conduct. This case is about the victimization wrought on those

19

who had no role in creating any of the defendant's problems, but are forced to bear the brunt of them nonetheless.

The PSR makes clear that the defendant has been treated repeatedly at inpatient facilities, including the Connecticut Valley Hospital (CVH).   Sadly, the defendant even chose to direct several of his threats to mental health facilities that have tried help him in the past.   The defendant's inability to conform his behavior to the norms of society warrants a period of imprisonment.   The Government agrees with defense counsel that the defendant should continue to receive mental health treatment during incarceration so to assist him in addressing his issues and to reduce the likelihood he reverts to threatening behavior.

### D.   The Defendant's History and Characteristics

The Court should consider the defendant's negative and positive history and characteristics. His parents raised him in a working class home.   At age 14, his mother was diagnosed with cancer and her reportedly cared for her rather than attend school.   His feels guilty for his mother's illness and death.   PSR ¶ 113.   At age 16 he isolated himself and obsessed on serial killers.   At age 20 he sent local law enforcement a threatening letter and was hospitalized.   PSR ¶ 114.   In 2001, he weighed 605 pounds and his father cared for him.   He was hospitalized at times.   PSR ¶ 115.

The defendant has an extensive criminal record starting at age 20.   He has convictions for larceny 3rd, attempted aggravated assault, harassment 2nd degree, threatening 2nd degree (three), and communicating a bomb threat by mail and mailing threatening communications (excluding the 2015 convictions for 2010 conduct).   PSR ¶¶ 94-104.

The defendant is not married and has no children.   PSR ¶ 117.   He currently weighs 309 pounds, uses a cane to walk, and takes medications.   PSR ¶ 118.   He abused alcohol at age 16, but has not consumed alcohol since 2006.   ¶¶ 119.   The defendant has an extensive mental health history and has various diagnosis and has tried to commit suicide and physically harm himself.   PSR

¶¶ 121-127.   He reports he received his GED and attended college.   PSR ¶ 128.   He has been

unemployed since 1998 and has received disability benefits since the 1990s.   PSR ¶ 129.   He

reports no assets.   PSR ¶ 130.   Based on his financial conduction, he is unable to pay a fine.

To his credit, the defendant acknowledges he engaged in the criminal conduct outlined in the

plea agreement and PSR, and pleaded guilty in this case.   PSR ¶¶ 88, 89, PSR Addendum (Doc. 41-

1), Def. Sent. Mem. at 8.   His post-arrest conduct in this case shows real promise.   Following his

arrest in September 2018, the defendant did not continue to write threatening letters as he had done in

2010 following his arrest.   Also, unlike in the 2010 case, he entered into a written plea agreement

acknowledging his guilt and admitting his violation of supervision.   While detained, the defendant

appears to working to improve how he thinks and how acts toward others, and he is improving as an

artist.   A letter of support dated January 7, 2020, advised the Court that the defendant, who the

author first met in 2014, was doing well during discussions in a Bible correspondence course and had

grown spiritually.

E.   Educational and Vocational Training, and Medical Care and Treatment

No one questions that the defendant has a significant history of mental illness that impacted

his ability to function as a law-abiding member of society.   PSR ¶¶ 121-127 (noting his PSR from

the 2010 case), 155.   The defendant has had access to treatment, including residential treatment

facilities like Connecticut Valley Hospital ("CVH") many times over many years.   Regrettably, he

has been moved within CVH for his "assaultive and/or threatening behavior" PSR ¶ 122, and in 2008

wrote threatening letters to "staff, patients, administrators, and local politicians," in order to facilitate

a move out of CVH, PSR ¶ 123.

A psychiatric evaluation completed on July 19, 2019 found the defendant has a rational and

factual understanding of the court proceedings and was able to rationally assist in his defense.    PSR

¶ 127 (noting a history of exaggerating his mental health symptoms).   The Government and law

enforcement investigators sincerely hope that the defendant is able to productively and successfully

address his mental health issues.    The Government has no objection to the defendant's request for a

Federal Medical Institution designation with the one clarification that those facilities are not always

available given the high demands on the BOP for treating inmates.

      F.   Consideration of the Harm to the Victims

      Finally, the Government asks the Court to consider the significant harm many victims

suffered because of the defendant's threatening conduct and the financial costs incurred and law

enforcement response due to his threatening conduct.    PSR ¶ 155.    His vial and repugnant

threatening communications that included blood and white powder were traumatizing and in

many instances included cruel racial and ethnic slurs

CONCLUSION

      The Government respectfully requests that the Court impose a sentence that sufficiently

punishes the defendant for his threatening conduct in the new case, impose a sentence that

punishes him for breaching the Court's trust when he violated his supervision by engaging in the

same threatening conduct, and impose a three-year term of supervised release that includes

mental health treatment.

                        Respectfully submitted,

                        JOHN H. DURHAM
                        UNITED STATES ATTORNEY

                        /s/
                        PETER S. JONGBLOED
                        ASSISTANT UNITED STATES ATTORNEY
                        Federal Bar No. CT03192
                        157 Church Street; 23rd Floor
                        New Haven, Connecticut    06510
                        (203) 821-3742
                        peter.jongbloed@usdoj.gov

22

<u>CERTIFICATE OF SERVICE</u>

This is to certify that on October 6, 2020, a copy of foregoing Government's Memorandum In Aid of Sentencing was filed electronically and served by mail on anyone unable to accept electronic filing.   Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's CM/ECF System.

/s/
PETER S. JONGBLOED
ASSISTANT UNITED STATES ATTORNEY
