```
                    UNITED STATES DISTRICT COURT
                      DISTRICT OF CONNECTICUT
_____
UNITED STATES OF AMERICA,       )
              Plaintiff,        ) No: 3:19-cr-00126-KAD
                                )                            )
      v.                        )
GARY JOSEPH GRAVELLE,           )
              Defendant.        )
- - - - - - - - - - - - - - - - )
UNITED STATES OF AMERICA,       ) No: 3:10-cr-00206-KAD
              Plaintiff,        )
      v.                        )
ROLAND PREJEAN,                 ) January 27, 2021
              Defendant.        )
_____) 2:06 p.m.

                              Brien McMahon Federal Building
                              915 Lafayette Boulevard
                              Bridgeport, CT 06604

                    SENTENCING/MOTION HEARING

B E F O R E:
        THE HONORABLE KARI A. DOOLEY, U.S.D.J.

A P P E A R A N C E S:
For the Government:
      PETER S. JONGBLOED, AUSA
      U.S. Attorney's Office
      157 Church Street, 25th Floor
      New Haven, CT 06510
      203-821-3742
      Email: Peter.Jongbloed@usdoj.gov

For the Defendant:
      JOSEPH PATTEN BROWN, ESQ.
      Law Offices of Pat Brown
      43 West Main Street
      Avon, CT 06001
      860-878-4311
      Email: jpb@patbrownlaw.com

Also present:
      VICTORIA AGUILAR, USPO
      KEITH HALL, FBI


Courtroom Deputy:                    Official Court Reporter:
Kristen Gould, Esq.                  Tracy L. Gow, RPR
```

1              (Call to Order, 2:06 p.m.)

2              THE COURT:  All right.  Good afternoon, everybody.

3              MR. JONGBLOED:  Good afternoon, Your Honor.

4              THE COURT:  We are here for the sentencing in the

5    matter of United States v. Gary Joseph Gravelle, proceeding

6    in two separate matters:  3:19-CR-126 and 10-CR-206.

7              Counsel, please identify yourself for the record.

8              MR. JONGBLOED:  Good afternoon, Your Honor.  Peter

9    Jongbloed on behalf of the United States, and seated next to

10   me is Special Agent Keith Hall of the FBI, one of the four

11   case agents.

12             THE COURT:  All right.  Good afternoon.  Good

13   afternoon.

14             And for Mr. Gravelle?

15             MR. BROWN:  Attorney Pat Brown, Your Honor, for Mr.

16   Gravelle, who is present in the courtroom, seated across from

17   me, socially distanced in front of Your Honor.

18             THE COURT:  All right.  Good afternoon, Mr. Brown.

19   Good afternoon, Mr. Gravelle.

20             THE DEFENDANT:  Good afternoon, Your Honor.

21             THE COURT:  I do try to enforce the social

22   distancing.  We obviously have masks, and we have taken other

23   measures.  I will say, Mr. Brown, if you need to have a

24   private conversation with Mr. Gravelle, just let me know

25   that, and you can go into my -- assuming this doesn't present

1    an issue for the marshal or the transport -- you can go into

2    my jury room where you can stay socially distanced and have a

3    private conversation.  Okay?

4            MR. BROWN:  Thank you, Judge.  I think we covered it

5    all ahead of time.  But if not, I'll let you know.  Thank

6    you.

7            THE COURT:  All right.  Thank you.

8            The record should reflect that we're proceeding by

9    way of a hybrid format.  Court staff are participating

10   remotely.  The public has access to these proceedings through

11   the videoconference platform.  I will note for the record

12   that Probation Officer Aguilar, who prepared the Presentence

13   Investigation Report, is also present and participating

14   remotely.

15           On January 6 of 2020, Mr. Gravelle pled guilty to

16   five counts of Maliciously Conveying False Information about

17   Explosives, in violation of Title 18 U.S.C. Section 844(e),

18   as contained at Counts One, Two, Five, Six and Ten of the

19   Indictment.

20           He pled guilty to Count 13, charging him with

21   Providing False Information Regarding a Criminal Offense, in

22   violation of Title 18 Section 1038; and he pled guilty to

23   Count 16, Making Threats Against the President of the United

24   States, in violation of Title 18 Section 871(a).

25           In Docket Number 10-CR-206, Mr. Gravelle also

1  admitted to violating the terms of his supervised release.

2          The matter was referred to the United States

3  Probation Office for preparation of a Presentence

4  Investigation Report.  The final report, to include multiple

5  attachments, was filed on March 11th of 2020.  The

6  Defendant's Memorandum in Aid of Sentencing was filed on

7  September 29th, 2020.  It was then, thereafter, supplemented

8  with an additional memorandum.

9          I received the Government's Memorandum in Aid of

10 Sentencing on October 6.

11         I have had the benefit of the competency examination

12 that was conducted in this matter, as well.  I have received

13 a letter from a victim, which I believe was forwarded to

14 counsel.  And I have received letters in support of Mr.

15 Gravelle, as well.

16         I have met with Officer Aguilar.  I have reviewed

17 her sentencing recommendation, as well.

18         So let me ask, is there anything that was submitted,

19 that the parties are aware of, that I did not list in advance

20 of sentencing?

21         MR. JONGBLOED:  Not from the Government, Your Honor,

22 no.

23         THE COURT:  Okay.

24         MR. BROWN:  No, Judge.

25         THE COURT:  Okay.  Thank you.

1        MR. BROWN:  Thank you.

2        THE COURT:  All right.  So let me ask Attorney

3   Brown:  Have you and Mr. Gravelle had an adequate opportunity

4   to review the Presentence Investigation Report and its

5   attachments?

6        MR. BROWN:  Yes, Judge.

7        THE COURT:  And do you have any objections to the

8   factual statements contained in the report?

9        MR. BROWN:  I do not, Your Honor.

10       THE COURT:  Okay.  And let me ask the Government,

11  same question:  Have you had an adequate opportunity to

12  review the report?

13       MR. JONGBLOED:  Yes, Your Honor.

14       THE COURT:  And do you have any objections to the

15  factual statements in the report?

16       MR. JONGBLOED:  No, Your Honor.

17       THE COURT:  All right.  So, there being no

18  objections to the facts contained in the Presentence

19  Investigation Report, I'm going to adopt those factual

20  statements as my finding of facts in this case.

21       Mr. Gravelle, it's important that I state for the

22  record the maximum and available penalties that could be

23  imposed here today.

24       On Counts One, Two, Five, Six and Ten, violation of

25  Title 18 Section 844(e), you face a maximum penalty of 10

1  years of incarceration, a three-year term of supervised

2  release, a maximum fine of $250,000, restitution as may be

3  ordered by the Court, and a special assessment of $100.

4          On Count 13, the violation of Title 18 Section 1038,

5  you face a maximum penalty of five years' incarceration, a

6  three-year term of supervised release, a maximum fine of

7  $250,000, restitution as may be ordered by the Court, and a

8  special assessment of $100.

9          On Count 16, Making Threats Against the President --

10  again, that's Title 18 Section 871 -- you face a five-year

11  period of incarceration, a three-year term of supervised

12  release, a maximum fine of $250,000, and a special assessment

13  of $100.

14          In addition, you face a maximum 24-month period of

15  incarceration for the violation of supervised release.

16          As a result, based upon these seven offenses and the

17  violation of supervised release, you face, in the aggregate,

18  a 62-year period of incarceration; a three-year term of

19  supervised release; a maximum fine of $1,750,000; restitution

20  as may be ordered by the Court; and special assessments of

21  $700.

22          If you are placed on supervised release and you are

23  later found to have violated the term of that supervised

24  release, you could also face an additional sentence of

25  incarceration of up to two years.

1          Do counsel have any correction or disagreement with

2    my stated maximum and available penalties in this case?

3          MR. JONGBLOED:  No, Your Honor.  I didn't know if

4    you indicated the special assessments, they accrue to the

5    total of -- special assessments; did you say that, Your

6    Honor?

7          THE COURT:  I did.  $700.

8          MR. JONGBLOED:  That's it.  Thank you.

9          THE COURT:  Okay.  Mr. Brown?

10         MR. BROWN:  No, Judge.  Thank you.

11         THE COURT:  Okay.  I will note for the record that

12   because these are Class C and D felonies, the Defendant is

13   statutorily eligible for Probation, the authorized term of

14   which would be one to five years, under Section 3561(c) of

15   Title 18.

16         The Sentencing Guidelines in the PSR appear to me to

17   be correctly calculated.  I understand that there are

18   arguments to be made as to why the range should be adjusted

19   under *United States v. Fernandez*, but let me ask just in

20   terms of propriety of the calculation in the first instance,

21   do counsel agree?  Mr. Jongbloed.

22         MR. JONGBLOED:  Yes, Your Honor.

23         THE COURT:  Thank you.

24         MR. JONGBLOED:  We have no disagreement with the way

25   the Guidelines were calculated in the PSR.

1          THE COURT:  Okay.  Thank you.  Before I ask you,

2   Attorney Brown, let me just ask Attorney Jongbloed:  Do you

3   have any information as to how or why the prosecution for the

4   2010 conduct sat idle for five years only to be reinvigorated

5   in 2015?

6          MR. JONGBLOED:  I have no idea, Your Honor.  To the

7   extent I am able to make that inquiry, I didn't get any

8   information.

9          THE COURT:  Okay.

10         MR. JONGBLOED:  And, in fact, I can tell the Court

11  that I never imagined when I was calculating his criminal

12  history category, and I'm conveying that information to Mr.

13  Brown, never imagined that the state court --

14         (Zoom interference - Reporter interruption.)

15         MR. JONGBLOED:  Your Honor, I never imagined that

16  while Mr. Gravelle was serving his term of incarceration for

17  conduct that, in the Government's view, is very similar to

18  what he ultimately pled to in State court, that the State

19  would require him to plead guilty and then sentence him --

20  and I think all *in absentia*.  I don't know how they were able

21  to do it while he was still in custody.

22         THE COURT:  It's a little bit of a mystery.

23         MR. JONGBLOED:  To the Government, yes, Your Honor.

24  And I think -- I just want to be clear, because I've

25  explained this to counsel.  That's what led to the Government

1    not including it in its calculation for his Criminal

2    History.

3            THE COURT:  And I'll let you know now that I'm going

4    to, under *Fernandez*, sort of honor the plea agreement in

5    light of those circumstances, and I'll talk about that a

6    little more.

7            Attorney Brown, any objection to the Guidelines as

8    calculated in the PSR?

9            MR. BROWN:  With the qualification -- I mean, I know

10   it's technically not an objection, but the qualification you

11   mentioned about *Fernandez*, no, I don't have an objection.  I

12   was aware of that prosecution not starting, or, you know, the

13   2015 issue, at the time, because Mr. Gravelle contacted me,

14   in custody, when that happened.  It was an incident out of

15   Thomaston, if I'm not mistaken.

16           And I attempted, without success, to contact, you

17   know, the lawyer assigned to defend him.  I've tried to get

18   the Chief Public Defender's Office in Connecticut to just

19   assign it to me.  And, in retrospect, you know, then I never

20   heard anything back and I just didn't follow up.  So I should

21   have just done it myself and not charged anybody, but I

22   just -- I figured it would die on the vine, so to speak,

23   because he had already pled here.  And, you know, I don't

24   know what happened, and I don't even think Gary knows exactly

25   what happened, to be honest.

1          THE DEFENDANT:  Your Honor, all I know is I was in

2    federal custody, I got a notice of a detainer out of

3    Thomaston.  I filed that IAD thing with some assistance.

4    They brought me all the way back from Maryland to

5    Connecticut.  And while I was going back, another charge

6    popped up in Middletown, which I think was a misdemeanor.  So

7    I pled guilty to all of that and was sentenced.  It was run

8    concurrent.

9          There was a -- out of Thomaston, there was some kind

10   of a sentence where if I behaved for two years -- there was a

11   penalty of like seven years, but as long as I was good for

12   two years that penalty would be dismissed.  I don't remember

13   what they called it, but I did go all the way back to

14   Connecticut.  Thomaston came and got me.

15         THE COURT:  Okay.  Well, thank you.  Let me just

16   state for the record, that prosecution, and whatever criminal

17   history points it adds to the mosaic, are not going to inure

18   to Mr. Gravelle's detriment here today.

19         So, there being no objection to the actual

20   calculation, let me indicate that, since none of these

21   offenses are grouped, a separate offense level must first be

22   determined for each count, and thereafter, an analysis to

23   determine the number of units resulting from the seven

24   distinct offenses under the grouping rules has to be

25   undertaken.

1          What I'm going to do, is I'm going to adopt the

2     separate offense level calculation contained in the PSR, as

3     well as the grouping analysis contained in the PSR, generally

4     appearing from paragraphs 40 to 90.  That analysis results in

5     a Total Offense Level of 24, a Criminal History Category of

6     V, and a resulting Guideline range for imprisonment of 92 to

7     115 months, which is a Zone D sentencing range; for

8     supervised release, one to three years; for a fine, 20,000 to

9     200,000; and, of course, there's a mandatory special

10    assessment of $700.

11         In addition, the Guideline range on the supervised

12    release violation is 24 months, which sentence can run

13    concurrently or consecutively to the sentence imposed on the

14    present Indictment.

15         Other than subject to the statements previously

16    made, do either counsel have any objection to that Total

17    Offense Level and Guidelines calculation?  Mr. Jongbloed.

18         MR. JONGBLOED:  No, Your Honor.

19         THE COURT:  Mr. Brown.

20         MR. BROWN:  No, Judge.  Thank you.

21         THE COURT:  Okay.  Now, I know that this is a case

22    where there are multiple identifiable and identified victims

23    have they been notified, Attorney Jongbloed, of today's

24    proceedings and of their right to be heard?

25         MR. JONGBLOED:  Yes, Your Honor.

1    THE COURT:  And are there any victims participating

2    over the -- I'll note for the record there does not appear to

3    be any present in the courtroom.  Are there any victims

4    participating over the videoconference platform who wish to

5    be heard?

6    MR. JONGBLOED:  None that wish to be heard.  But as

7    of last night, we -- and first thing this morning, I'm

8    informed by our Victim Witness Coordinator that she sent the

9    Zoom link for today's proceedings to the victims in this

10   case.

11   THE COURT:  All right.  Thank you.

12   And I'll repeat what I said earlier.  I did receive

13   an e-mail from one of the victims, a court personnel, that I

14   have reviewed in terms of a victim impact statement.

15   MR. JONGBLOED:  Right.

16   THE COURT:  All right.  Mr. Gravelle, I will hear

17   from you if you wish to make a statement.  You're not

18   required to make a statement, but I assure you I will listen

19   closely to whatever it is you have to say.  I will also hear

20   from your attorney regarding the appropriate sentence to be

21   imposed in this case.

22   After I hear from you and your attorney -- in

23   whatever order you decide, Mr. Brown -- I'll hear from the

24   prosecutor, and at that point we will have a discussion about

25   the appropriate sentence to be imposed in this case.

1           Mr. Brown, it is my practice to defer to defense

2    counsel in terms of the order of presentation.  However you'd

3    like to proceed, sir.

4           MR. BROWN:  I'll go first if that's okay, Your

5    Honor.

6           THE COURT:  That's fine.

7           MR. BROWN:  I won't take up too much of your time.

8    It's not an unusual situation to find myself in, in terms of

9    a different kind of cases.  You know, as I'm sure Your Honor

10   will recall from the both the serious and -- not that they're

11   not serious, but GA level, you know, courtrooms, there seems

12   to be a plethora of cases that repeat themselves -- you know,

13   domestic violence, drugs on the more serious end, things like

14   that.

15          This is an unusual crime.  I've represented people

16   charged with this crime in the past, and they've usually come

17   in bunches, in that they do a bunch of things -- though not

18   this much.  And, you know, but I -- I have not had a repeat

19   of something like this before, so it is an unusual situation.

20          I can -- I can tell the Court that Mr. Gravelle, as

21   you know, has been in custody for a while.  He has availed

22   himself of many programs, though those have been kind of

23   curtailed since the COVID epidemic began.

24          The nature of his crime and what I believe causes

25   it -- you know, I mean, the programs that are offered right

1  now at Wyatt or when he was in state custody before, just

2  because of, I guess, housing issues putting him at Wyatt, are

3  limited -- are limited assistance to him.  His problems are

4  not caused, generally, by substance abuse.  They're primarily

5  caused by mental health issues.  And where he's been

6  incarcerated for the last several years has been very

7  ill-equipped to deal with that.

8         He's also caught COVID and been housed in solitary

9  confinement, at Northern, near the beginning of the pandemic,

10 and I don't think he was treated very well.  But I think,

11 mostly, that the guards had a lot of fear of the unknown at

12 the time, so they locked him in a cell.  And I don't know

13 if -- you know, almost like a pandemic movie, and throwing

14 food at him and not giving him clean clothes kind of thing.

15        And, you know, this is just one of those situations,

16 Judge, where I think you know from the -- not just the PSR,

17 but the evaluation, that it seemed like the facility at

18 Devens kind of struggled with what to do with Mr. Gravelle.

19 And I say that based on my conversations with them, as well

20 as the amount of time it took to get the report back.

21        When I represented Mr. Gravelle before, we all had

22 the expectation that he would be sent to a mental health

23 facility.  And that did not occur.  Again, there was a strong

24 recommendation from the judge, including the Assistant U.S.

25 Attorney, who was not, you know -- a different one who

1   handled it at the time.

2          You know, this is one of those situations where if

3   you could go back to the pre -- you know, I don't remember

4   exactly when it happened that we got rid of the vast majority

5   of federal mental health facilities, where, you know, like

6   where John Hinkley went, which I think is one of the reasons

7   that they got rid of it, is because it caused a lot

8   controversy that he got to go to -- on a much lower

9   standard -- to a federal mental health facility, as opposed

10  to a prison.  But it seems like -- and that's not available,

11  I know, but it seems like that's just the kind of place that

12  Mr. Gravelle really needs to be.

13         And I don't know how much good a jail environment --

14  particularly if he's not at a place like Devens or, you know,

15  a place that has a federal medical center equipped to deal

16  with him -- is going to do him well.  But I do know from

17  speaking to the Government in this case that they've assured

18  me they're going to take steps to try and get his medical

19  records that we've provided to them directly to the

20  appropriate people at the BOP that make that decision, which

21  I, in all fairness to the last U.S. Attorney, I don't think

22  any of us imagined that that would have been something

23  necessary to do.  So it's not that -- the fact that it wasn't

24  done before was, you know, some kind of fault.  It was as

25  much my fault as anyone else's.

1    And in light of that, Your Honor, I just know that,

2    you know, Mr. Gravelle needs services, he needs help.  I'm

3    just -- I just don't think that, you know, the chance of

4    getting him that help, both with the help that would be

5    available on supervised release, and hopefully --

6    hopefully -- in the custody of the BOP, would be met by

7    having him do -- you know, if you granted the *Fernandez*

8    departure and, you know, gave him something near the bottom,

9    you know, having to do eight or nine years, as opposed to

10   the, you know, six or so that I would be asking for is going

11   to really make that big of a difference.

12       I mean, I don't think you can let him go.  That

13   would be silly for me to suggest that.  I mean, you know, the

14   Court has to do something, and you have to do something

15   serious.  You can't do something, you know, that would be

16   considered extremely lenient.  I don't think what I've asked

17   for is lenient, so to speak.  I do think it's probably --

18   it's definitely less than I think a Court should give someone

19   who didn't have his mental health issues.

20       I will say that all of the victims in this case, as

21   well as the last one, as best I can tell, and, I mean there

22   may be an exception -- I don't think so -- but as best I can

23   tell, I think they were all pretty much chosen at random.

24   Not from a phone book, but he may have, like for example,

25   heard Your Honor's name before and that's just why he picked

1    you.  I don't think there was any kind of -- it wasn't Your

2    Honor, obviously, but I meant if it had been.

3           But I don't think that, you know, the Federal

4    Defender or -- who I don't think has ever even represented

5    Mr. Gravelle, or Judge Bryant, or the last one we had.  There

6    was some rabbis, the Mormon prophets, some imams.  I mean,

7    people were just thrown in to get the biggest splash possible

8    in Mr. Gravelle's mind, so to speak.

9           I don't know what else I can say other than that.

10   I've said everything else I can say in the memo.  And Your

11   Honor is familiar with the record.  His history is

12   well-known.  You know, I just -- I just wish there was a

13   medical facility that you had the authority to order him to,

14   you know.  And by "authority," I mean you could order it and

15   it would definitely be obeyed.  I mean, I know you can

16   recommend it, and I'm obviously going to ask you to recommend

17   that and have --

18          THE COURT:  Do you have a specific facility?  I know

19   that there's a pretty extensive medical facility in -- I

20   think it's Carlisle, Texas.  I know -- obviously, we know

21   about Fort Devens.  There may be others.  I think there's a

22   medical facility in North Carolina.  Is there a particular

23   facility that you would ask me to have the Bureau consider

24   specifically?

25          MR. BROWN:  Any is better than none, but the only

1   reason that I would specifically ask for Devens is because I

2   spoke with the people there while he was being evaluated, and

3   he seemed to have a good rapport with them and reacted well

4   to their treatment efforts.  Like, he followed their

5   guidance.  He seemed to respond well and do well while he was

6   there.

7           As you may recall, Your Honor -- I don't know if you

8   recall this, because I know you have a lot of cases and many

9   defendants in your court I'm sure write you letters,

10  complaining about various things.  But I know that they don't

11  usually write me or write the prosecutor.

12          When Mr. Gravelle got back from Devens as he

13  started -- I don't know what the right term is --

14  decompressing, whatever -- you know, deprogramming, whatever.

15  I mean, he started writing what I'll characterize as some

16  pretty, you know, inconsistent letters, to the Court and the

17  prosecutor and myself, and the various senators.

18  Non-threatening, though, this time, you know.  But -- and

19  then they slowly, as he's gotten back to Wyatt, which has

20  done a better job getting him on his medication than the

21  state jails did, those have stopped.

22          And my conversations with him are more consistently

23  productive than they were before.  So I think that was at

24  least anecdotal evidence that they knew what they were doing

25  and were able to deal with him.

1        And with that, Your Honor, I would ask you,

2   obviously, to waive a fine because he's indigent.  I don't

3   think anyone's made a claim for restitution.  The Government

4   didn't have any information, and I don't know if anyone's

5   made any to Probation.  If one has been made, I would ask

6   Your Honor to defer him having to pay it until after he

7   finishes his sentence.

8        The last sentence he did, Social Security pays him

9   -- they don't pay him while he's in jail, but they pay him

10  when he gets out of jail, and he paid full restitution to the

11  Thomaston Police Department upon the conclusion of his last

12  sentence.  So, I don't think there is any in this case; but

13  if there is, I would make that request.

14        Thank you, Your Honor.

15        THE COURT:  Mr. Gravelle, do you wish to make a

16  statement?

17        THE DEFENDANT:  Yes, please.

18        THE COURT:  Okay.  I'm just going to ask you -- you

19  don't have to stand up, but I'm going to just ask that you

20  speak slowly and clearly and into the microphone.  Okay?

21        THE DEFENDANT:  Yes, ma'am.

22        THE COURT:  Okay.

23        THE DEFENDANT:  Well, I wrote something up.  It was

24  quite long.  I'm actually glad that I don't have it.  You

25  know, with all the moving around, it was almost impossible to

1   keep track of it.  But I actually -- I'm probably going to

2   try to say most of what I had written, but I think it's

3   better just coming, like, off the top of my head.  I'm not

4   very good at memorizing anyway, so I probably wouldn't have

5   memorized it.  And I think I would have felt a little awkward

6   trying to read it off the paper.  It wouldn't have felt

7   authenticate.

8           First, I just want to apologize, especially to the

9   victims, people I hurt -- that there was just no

10   justification for it -- but to everybody involved.  And I

11  wrote up an apology for the Victims Advocate people.

12  Obviously, I can't contact the victims, and wouldn't.  But I

13  didn't want that to be read into the record or presented to

14  you before I was sentenced, nor do I now.  I want it to be

15  presented after, because I didn't -- I don't want to diminish

16  the harm that I caused, and I wouldn't want you or anyone

17  else to think that I wrote the apologies just to get some

18  kind of a lighter sentence, because that -- that wasn't the

19  case at all.

20          One of the reasons I wanted to be sentenced

21  in-person was because I wanted to have a chance to actually

22  speak, you know, in the same room that you were in and the

23  agents were -- well, what agents could be here.  I am really

24  sorry.

25          I think the thing that caused me the most regret and

1    shame about my behavior is that it was -- it was just

2    uncalled for.  When I got out of prison the last time, I

3    didn't try at all.  It's no wonder that I failed.  When I was

4    in prison, I spent most of my time feeling sorry for myself.

5    I didn't do any groups.  I didn't take any classes.  I ended

6    up in and out of, what they call the SHU, the segregation.

7    And when I got out, I was blessed with this huge team of

8    support.  So there were people there that I could have

9    reached out to in a different way.

10           If you asked me to explain why I committed these

11   crimes, in one or two words it boiled down to -- to me

12   needing attention.  And I'm ashamed to say that.  And I had a

13   lot of fear about coming here and saying that out loud,

14   because I accepted it some time ago, but it's just not an

15   easy thing to say about yourself.  But it's true.  Not

16   attention as far as wanting to be famous or -- but my

17   probation was ending.  And ever since -- I don't know -- my

18   late 20s, I've had issues with not thinking I could take care

19   of myself and always looking for someone else to take care of

20   me, fearing that I couldn't do it myself.

21           With probation ending, even though I had therapy and

22   I had other things, I just assumed that my life was going to

23   fall apart and that the best thing for me, and what I

24   deserved, was to never be free again, to be put away

25   somewhere where I would be taken care of.  And even though I

1    kind of fought with myself when I wrote those terrible
2    letters, the entire time it was a battle about writing them
3    and then mailing them, but I knew it was wrong.  And I did it
4    because I wanted to be put away.
5            The only person I really wanted to hurt, even though
6    I ended up hurting a whole group of people that didn't
7    deserve it, was me.  I was trying to hurt myself.  That's why
8    I signed all the letters.  That's why I put my return
9    address.  In that sense, I wasn't trying to get away with
10   anything.
11           Of course, once you commit a crime like that, you
12   start realizing what you've done, the harm you've caused, not
13   just to other people, but to myself.  Not to sound selfish,
14   but once the realty hit and I came back to this courthouse
15   and I started thinking, Well, I may have done what I want --
16   what I thought I wanted, which was to get a life sentence,
17   then I realized that I don't want to life sentence.  Prison
18   is hard.  You know, prison is not a nice place.  I kind of
19   suffer there.  I put myself there, but -- anyway, I'm sorry.
20   I don't mean to ramble.
21           But I just feel like it was just unnecessary, and
22   that's what I had the most shame for.  I have learned that I
23   have to stop hating myself, because I can't be a productive
24   person in society or even in prison if I have no -- if I
25   don't see any value in myself.  So I've worked really hard at

1  trying to get past that, and I think I've done a better job.

2         This time, I haven't had any behavioral incidents

3  while I've been incarcerated.  I haven't gotten in any

4  trouble.  I wrote some letters early on that I regret

5  writing.  But like Mr. Brown said, once I went to Devens and

6  I received some treatment, and then -- really, when I got

7  sick with COVID, after I recovered I realized that -- that

8  life itself is precious, and that I need to stop looking for

9  other people to solve all my problems and realize that

10  I'm -- that it's just a great thing to be alive.

11         And since then, if you've noticed, there have been

12  no more inappropriate letters.  I haven't had any behavioral

13  issues.  I've been patient about the postponements for the

14  sentencing.  You know, we had snow issues, we had other

15  issues.

16         But more than anything, I'm trying to use my time

17  wisely.  I took those classes.  When I get to the BOP,

18  wherever they send me -- and I hope it is a medical, because

19  I did well at Devens because they have a mental health unit,

20  so I had real peers there.  In a population setting that's

21  not mental health, it's hard for me because I feel like I

22  don't fit in.

23         And, so, I'm hoping.  But I'm going to make the best

24  of wherever they send me.  I'm also going to make the best of

25  whatever sentence you give me.  I feel it's most important

1   for me to take responsibility and -- because I hurt those

2   people, and there was no need for it.  And I'm really sorry

3   for that.

4          I can assure you that I have changed a lot, and I'm

5   going to work really hard.  I want -- the last time, I didn't

6   have any plans for when I got out.  I didn't have any hope

7   for a better life, for a productive life.  I just was the

8   same person I was when I went into prison the last time.  I

9   -- I don't think I'm the same person this time, and I think

10  if I work really hard, and with some support, which I feel

11  like the BOP is available to provide, and then when I get out

12  I intend to really participate this time in the services that

13  were available the last time.

14         I regret what I did, and I'm just really sorry.  I'm

15  not going to promise you that I'll never make a mistake

16  again, because that would be a promise I probably couldn't

17  keep.  But I won't fail this time for lack of effort, and I

18  guess that's what I wanted to make the strongest point on.

19  That, and I am ashamed of what I did.  I'm most sorry and

20  regretful because it just was unnecessary.  And I hope the

21  people that I harmed someday can forgive me.

22         Thank you.

23         THE COURT:  Thank you, Mr. Gravelle.

24         All right.  Mr. Jongbloed, before I hear from you,

25  let me ask, for the record, whether or not any of the

1    municipalities or agencies who had to respond to any of these

2    incidents have sought restitution?

3              MR. JONGBLOED:  No, Your Honor.  I think the

4    practical significance is many of them realize that

5    Mr. Gravelle is indigent, and it would take efforts to

6    collect all that information and make the presentation.  So

7    it's the Government's understanding that no one has made a

8    request for restitution in this case.

9              THE COURT:  Thank you.  All right.

10             Mr. Jongbloed, the floor is yours.

11             MR. JONGBLOED:  Sure.  Your Honor, if I could just

12   -- Your Honor may have done this, but just to confirm that

13   Mr. Gravelle has read the PSR and consulted with his lawyer.

14   You may have said that, but I may have missed it.

15             THE COURT:  Mr. Gravelle, have you had an

16   opportunity to review the PSR with Attorney Brown?

17             THE DEFENDANT:  Yes, Your Honor, I have.

18             THE COURT:  Okay.  So you either read it or had it

19   read to you?

20             THE DEFENDANT:  I read the entire thing.  I have a

21   copy of it, and I went through it thoroughly.

22             THE COURT:  All right.  Thank you.

23             MR. JONGBLOED:  Thank you, Your Honor.

24             Your Honor, my comments are presented to the Court

25   to help the Court to come to a fair and just sentence for

1    Mr. Gravelle, who is -- to put it kindly to Mr. Gravelle,

2    he's unusual.  He's an unusual defendant who presents

3    different kinds of issues than the Court typically faces, and

4    so, my comments are designed to assist the Court to come to a

5    fair and just sentence for Mr. Gravelle, who, as everybody

6    recognizes, here for the second time for engaging in the same

7    kind of conduct.

8            And as he himself admits, he threatened to kill

9    people.  He threatened to injure public officials and private

10   citizens by blowing them up and damaging public and private

11   property.  And then as part of that, he violated the terms of

12   his supervised release and breached the Court's trust in him,

13   getting out and doing the things that the Court had asked him

14   to do, and he breached that trust by engaging in the same

15   conduct.

16           Now, the Government wants to tell the Court that

17   they're asking for -- we're asking for a sentencing somewhere

18   within or near a 77- to 96-month Guideline range for the

19   conduct in the -- what I'll call the '19 case, the new case,

20   as well as an additional period of imprisonment for breaching

21   the Court's trust in the supervised release violation matter,

22   but not to exceed 120 months.  That's what we submitted in

23   our sentencing papers, and that's to abide by the terms of

24   the plea agreement that the parties -- the plea agreement the

25   parties had entered into.

1          And just to reiterate, that the Government believes

2     that Mr. Gravelle will benefit from continued mental health

3     treatment while in prison, and then once released.

4          Now, as we all know, the Court can't say which

5     facility, and I've tried, through counsel, to explain to Mr.

6     Gravelle that, although the Government believes he needs

7     continued mental health treatment while incarcerated, the

8     Bureau of Prisons has to do that job of figuring out what

9     space they have available, the needs that Mr. Gravelle

10    presents, and whether or not they can accommodate those.

11         But it's everybody's expectation and hope that the

12    Bureau of Prisons will do that, and the Government will do

13    whatever it can to provide the Bureau of Prisons with

14    whatever records defense counsel wants to give us, and get

15    that down to the Bureau of Prisons.

16         Your Honor, the Defendant clearly acknowledged that

17    his conduct was serious.  And that, in the Government's view,

18    deserves a serious sentence.  In terms of the Criminal

19    History Category -- let me just get that out of the way, so

20    the Court clearly understands the Government's position with

21    that, is the Government -- the Court's found him to be a

22    Criminal History Category VI, the Government thinks it should

23    be --

24              THE COURT:  No, V.

25              MR. JONGBLOED:  The Court found him to be a V;

1   right?

2           THE COURT:  Right.

3           MR. JONGBLOED:  And so -- so the Government's

4   request is that the Court give effect to the parties' plea

5   agreement, which Your Honor is going to do.  But I just

6   wanted to let the Court know that, in following up on what I

7   previously explained, the Court can do it by the departure

8   that it's going to do.  But the conduct that occurred in

9   2019 -- sorry 2010 -- that are in paragraph -- I think it's

10  103 and 104 of the PSR, that is essentially the conduct that

11  Mr. Gravelle pled guilty to in the first criminal case, which

12  we'll call the 2010 case.  And therefore, the three

13  additional points that were given to him in the PSR are

14  essentially the same conduct.

15          And when you look at the Guideline calculations, it

16  does say that it's offense conduct afterwards, but in the

17  Government's view, it is -- "double counting" might not be

18  the right words, but it's the right result to sentence him as

19  Your Honor has determined his Guideline range to be.

20          Now, in imposing the sentence, the Court should

21  consider Mr. Gravelle's mental and emotional condition.

22  There's no way not to consider it.  And defense counsel

23  rightly says that the letters that were written right towards

24  the end of his term of supervised release were inconsistent.

25  Some were threatening and way over the top, and others were

1    apologetic and wanting to commit suicide.  So I'd ask that

2    the Court consider all that.

3          He knew he was engaging in wrongful conduct, because

4    he knew he did it back in 2010.  He's written -- he's

5    expressed a sincere, what appears to be sincere, regret for

6    doing it, and has apologized to the Court.  All good things

7    that, hopefully, will lead to a better time in prison for him

8    and then, as society wants, a better time when he is

9    ultimately released from prison and is serving his supervised

10   release term.  And then when that ends, hopefully he doesn't

11   engage in the same criminal conduct.

12         Now, counsel said that he -- I think it was just

13   painting with a broader brush, but Mr. Gravelle did pick some

14   people to write to, even though he did do a kind of almost a

15   mass mailing.  Either he --

16         THE COURT:  There's no question that some of the

17   victims were personal and particular to Mr. Gravelle.

18         MR. JONGBLOED:  Correct.  And I just wanted to just

19   reinforce that, because some of these people were the mental

20   health people who had provided care for him and who Mr.

21   Gravelle, I would assume, knows that that was hurtful to

22   them, because here's somebody they're supposed to be helping,

23   they want to help, and yet, he's threatening them.  And in

24   the one case, the whole mental health facility had to be

25   evacuated because there was a bomb threat.  And the same

1    people, like himself, who need care and need their life to be

2    as stable as possible, were evacuated during an evening.

3           Also, the probation officer who was supervising him,

4    that, in the Government's view, he was selected for that.

5    And, so, it's not just, you know, the certain entities, like

6    a prison out in Seattle or whatever, which appears to be

7    random.  There were some specific targeted things.

8           Now, in terms of the language, Your Honor,

9    Mr. Gravelle -- they were very hurtful.  He talks about high

10   explosives.  He talked about anthrax.  And then he went into

11   detail about what anthrax causes.  Some of the letters

12   contained white powder.  They were smeared with either blood

13   or feces.  And anyone opening them who doesn't know

14   Mr. Gravelle -- and that's the problem, and I want to

15   reinforce with him.

16          If somebody knew Mr. Gravelle, they might know how

17   to process that.  But most of the people that received this

18   didn't know Mr. Gravelle and didn't understand where he was

19   coming from.  And so, that's what makes this offense

20   particularly heinous.  And that's why if Your Honor -- and I

21   know Your Honor has looked at the statement that was provided

22   by the member of the court personnel.  She didn't know Mr.

23   Gravelle.  She didn't know who he was, and she didn't know

24   whether the powder in there was baby powder.  You know, the

25   mind wants to gravitate towards, This is not going to hurt

1   me, but then the mind also gravitates, But what if it is

2   meant to hurt me, and I don't know those things.

3          So, the letter or the email that was forwarded to

4   Your Honor and provided to counsel really explains how a

5   victim kind of processes this threat.  You know, she talks

6   about being quarantined in chambers for several hours, not

7   being able to wash her hands after touching the letter.  The

8   whole uncertainty, Can I eat, Can I not eat, what about my

9   plans for the evening, now I've got to get decontaminated,

10  now I've got to go to the hospital.

11         And, so, I think it's important for Mr. Gravelle to

12  understand that each victim is going to process this

13  differently, but here's an instance of one victim who

14  seriously -- it really seriously affected her.  And, so, when

15  he thinks about this, he should -- and based on his words, I

16  think he has started to appreciate this -- is that,

17  particularly in, you know, we're now in a COVID time, so it

18  almost like heightens people's understandings of what it's

19  like to be threatened.

20         And so, you know, I just want Mr. Gravelle to fully

21  appreciate, and I ask the Court to consider, the level of

22  terror that he instilled in some of the victims and the

23  consequences of having to evacuate buildings and prisons and

24  not knowing whether Mr. Gravelle intended what he intended or

25  not, because they didn't know who he was.  And then he's

1 talking about AKA assassins, so almost like he's talking

2 about there's people other than himself.  So it's not just

3 I'm going to do this, I've got other people who are going to

4 do it.  So not knowing whether or not there is a concerted

5 effort on behalf of this anarchist group or not.  And in

6 today's climate, those kind of threats take on all different

7 meanings.

8         Fortunately, Mr. Gravelle didn't act on any of his

9 threats.  But, unfortunately, the victims really didn't know

10 about that.  The Court -- the Government asks the Court to

11 take into account the importance of specific deterrence, in

12 terms of convincing Mr. Gravelle, based upon Your Honor's

13 sentencing, this is just not tolerated in a civil society.

14         The idea to protect the public from him.  Hopefully,

15 he gets the mental health treatment he needs, both in prison

16 and out of prison.  He fully understands and, hopefully, the

17 sentence will tell him and the public that this is not a

18 conduct that, as a civilized society, we're going to

19 tolerate.  But part of it is Mr. Gravelle has received

20 a -- it's -- his conduct is almost a failure, to some extent,

21 for -- you can understand why people who were working with

22 Mr. Gravelle have a sense of failure.  But he had

23 considerable mental health treatment throughout his entire

24 career.  Your Honor, if you look through the PSR, since a

25 very early age people have been trying to help him and

1   provide him with care.  He's been in repeated inpatient

2   facilities, including the Connecticut Valley Hospital, and

3   then he was, most recently under supervision and getting

4   treatment.

5          So people have been trying to help him.  It's good

6   to hear his words today that he is now going to accept that

7   help, he's going to work with people to try to better handle

8   the situation that he deals with.

9          Now, at paragraph 26 of the PSR, Mr. Gravelle talks

10  about wanting to commit suicide on September 25th of 2018,

11  and he said he didn't have the guts.  And I think it's

12  important, at least from the Government's perspective, to

13  explain to Mr. Gravelle and to the Court that it takes more

14  courage to live than it does to die.

15         So, Mr. Gravelle's decision not to kill himself, to

16  me, is more of courage than of a failure.  And he should

17  understand that the investigative team and the prosecution

18  team, the team that looked at his criminal conduct, as much

19  as we think it needs to be seriously prosecuted, as well as

20  punished, he should know that everybody on the team wants him

21  to do better.  And that life presents hardships for

22  everybody, and his challenges are -- may be different than

23  some, but everybody has hardships to varying degrees and --

24  for now and in the future.  And he made the right choice to

25  live.

1          And as much as the consequences of today's

2    sentencing may be hard for him to process, he just made the

3    right choice to continue to choose life and not commit

4    suicide, and I hope he understands that the Government

5    sincerely means that.

6          To his credit, he's acknowledged his wrongfulness.

7    He's engaged in post-plea conduct that has made him appear to

8    want to turn over a new leaf and engage in better conduct

9    going forward.  I don't know if Your Honor has had the

10   benefit of seeing some of Mr. Gravelle's artwork.  He's

11   talented.  He's -- he has a gift.  He's also engaged in

12   writing.  There are two letters from -- one from his pen pal

13   and from someone else.  He's joined a faith-based group.

14   Oftentimes, that helps people fill in the voids that they

15   have in their life.  Here's -- I can hold it up for the

16   Court -- is a letter that he addressed to the Government.  No

17   threats in it, but he spent time using colored pencils to

18   make what the Government views as somewhat of an attractive

19   envelope.

20          And, so, Mr. Gravelle has a good side to him, and

21   that's what I think the mental health providers found in him

22   and wanted to foster in him.  And we just hope that he uses

23   that time to continue in that vein, and continues writing his

24   letters to his pen pals that are positive letters.  To the

25   extent he has to release frustration or whatever, he finds

1    ways to do that that are lawful, and he -- but he doesn't

2    write letters to people that threaten them or cause them any

3    fear.

4          In terms of -- as explained in the Government's

5    sentencing memo at page 21, we talk about educational,

6    vocational training and medical care.  The Government wants

7    him to get the treatment that he should get, and we have no

8    objection to counsel's request for a federal medical

9    institution, one that's -- that can specifically deal with

10   his mental health treatment.

11         And finally, Your Honor, I just want to add, because

12   on the issue of the victims -- and it's important that Mr.

13   Gravelle understand that -- and we'd ask the Court to take

14   into account the significant harm that it caused many of the

15   victims in this case, and the cost to law enforcement to

16   respond to that, the cost of the agents having to go out and

17   cause victims to be decontaminated, the time it took away.

18         In this case, the district judge's chambers had to

19   be closed for approximately three days.  People had to be

20   quarantined for a period of time, decontaminated.  The

21   general disruption that that causes to the administration of

22   justice, all of that is taken into account in the Guidelines

23   in coming up with a Guideline range that Your Honor can

24   consider as an advisory range to impose the appropriate

25   sentence.

1      But it's important that Mr. Gravelle understands

2   that his conduct had serious consequence for just regular

3   people.  I mean, people who worked at a Planned Parent-kind

4   of a clinic, to help people make right decisions about

5   families.  People who worked for the -- for the -- what's

6   another example?  Mental health to other people.  People who

7   were providing -- religious organizations, providing

8   spiritual guidance to other people.  He -- there were imams,

9   there were rabbis, there were Christian institutions all

10  threatened by Mr. Gravelle.

11      So, it's not that he singled them out, but his

12  letters, when you look at the letters themselves, they did

13  specifically address certain areas of those people's faith.

14  So, for example -- or religious or ethnic make-up.

15      So, for example, with the NAACP, he made some very

16  hurtful statements about them being -- about their

17  characteristics and things like that.  And those are the kind

18  of things that, in the Government's view in decisions to

19  prosecute this case, it looked like there had been some

20  thought in that.  That wasn't just randomness.  Those letters

21  were carefully thought about, and those victims have been

22  severely harmed by his conduct.

23      So, Your Honor, based on all of this, the Government

24  would respectfully request that the -- ask that the Court to

25  sentence Mr. Gravelle within the range explained, and to add

1    an incremental punishment for the breach of the Court's trust

2    for his conduct while on supervision, for a sentence not to

3    exceed 120 months.

4            THE COURT:  Thank you.

5            Mr. Brown, do you wish to respond at all?

6            MR. BROWN:  No, Your Honor.  Just to explain one

7    thing.  When I said he didn't target anyone, I did say that

8    he sent them to some people that he knew.  What I meant by

9    that was that is, you know, that he didn't really have any

10   personal animosity with any of those people.  He had as much

11   animosity with them as he did with a stranger.  It was a

12   maximum effect kind of -- you know, for lack of a better

13   word.  But I don't have anything else to say other than that.

14           Thank you, Your Honor.

15           THE COURT:  Thank you.  All right.

16           Mr. Gravelle, when deciding an appropriate sentence,

17   I'm required to consider a number of different factors, they

18   are listed primarily in Section 3553(a) of Title 18.  They

19   include things like your background and characteristics, the

20   nature and circumstances of your offense.  I need to consider

21   the purposes of sentencing -- punishment, deterrence,

22   rehabilitation.  I need to consider the Sentencing Guidelines

23   and their advisory range.  I need to avoid unwarranted

24   sentence disparities among defendants with similar records

25   who may be convicted of similar conduct.  I haven't listed

1    all of the factors.  And I probably will not discuss all of

2    the factors, but I want to assure you that I have considered

3    them all.

4          And it's my obligation to take all of this

5    information, the good and the bad, and weigh it in a manner

6    that, hopefully, will lead me to a fair, just and reasonable

7    sentence.  My mandate is to identify a sentence that is

8    sufficient, but not greater than necessary, to serve the

9    purposes of sentencing.  And that's what I've tried to do,

10   and I'm going to explain my reasons and factors that I found

11   most significant in your case.

12         Let me begin by indicating that I am going to

13   exercise my discretion, and depart from the Sentencing

14   Guidelines downward.  I will honor the parties' plea

15   agreement, which contemplated a Criminal History Category of

16   IV, under *United States v. Fernandez*.

17         This is not just a nod to the plea agreement,

18   though.  This is particularly appropriate here, where the

19   convictions that raise the Criminal History level from IV to

20   V involve conduct that was -- I would say considered relevant

21   conduct or certainly related to his prior federal conviction

22   and sentence.

23         There really doesn't appear to be much rhyme or

24   reason to the State's prosecution for that conduct five years

25   after the fact.  And, frankly, the convictions don't really

1   add anything to Mr. Gravelle's criminal history.

2          So, the adjusted Guideline range, in light of this

3   departure, is 77 to 96 months.  This departure does not

4   impact the Guideline range, for the supervised release

5   violation, which remains 24 months.  So, with the starting

6   Guideline range of 77 to 96 months, I need the assess the

7   other potential bases for departure or non-Guideline sentence

8   that have been presented.

9          The Defendant has urged either a departure under

10  Section 5H1.3 or 5K2.13, or a variance based upon the

11  statutory factors, as well as what is argued as the

12  inequitable applicability of a six-level enhancement under

13  Section 3A1.2, which applies for the targeting of Government

14  employees.  The request is that the Court vary and apply only

15  a four-level enhancement.

16         The Government has disagreed that a six-level

17  enhancement is at all inappropriate on the facts of this

18  case.  The Government takes no specific position on the

19  departure requests, but advocates that a significant period

20  of incarceration is appropriate, recognizing that it is not

21  advocating for a sentence above 120 months, per the plea

22  agreement.

23         As with every case that comes before me, this case

24  presents both mitigating and aggravating factors, which

25  counsel the Court on the appropriate sentence.  In this case,

1    those factors pull the Court in decidedly different

2    directions -- and with some force, I might add.

3         I'm going to start with the mitigating factors,

4    because at the end of the day, it is the aggravating factors

5    which drive the Court's decision.

6         In mitigation, from a very young age, Mr. Gravelle,

7    you have struggled with serious and, oft, debilitating mental

8    health issues.  You have been hospitalized over the years in

9    an effort to help you manage your illness.  Your diagnoses

10   over the years has changed, but there is no doubt on this

11   record that you continue to struggle, nor can there be any

12   doubt that your mental health issues contributed

13   significantly to the events which bring you here today.

14        Your history also reflects that when you want a

15   change in your circumstances, or fear a change in your

16   circumstances, you act-out in an inappropriate fashion, to

17   either bring about the change you want or to forestall the

18   change you fear.  It is part mental health issue, part

19   manipulation of those around you -- largely, those trying to

20   help you.

21        You are clearly an intelligent and articulate person

22   who knows right from wrong.  Treatment providers or spiritual

23   counselors think very well of you.  I think -- whether it was

24   Mr. Jongbloed or Mr. Brown, there is a good side to Mr.

25   Gravelle.  You are not the sum total of the crimes which

1    bring you here.  And for almost three years, you complied

2    with your treatment, and you had made incremental progress

3    toward independent living.  It was not always smoothe

4    sailing, but you were doing all right and you appeared

5    genuinely remorseful.

6           At the time of your arrest, in September 2018, you

7    were both forthcoming about your conduct and apologetic.  And

8    that's meaningful, frankly, as were your statements here

9    today.  And it's all part of a very complicated mosaic that

10   the Court must navigate this afternoon.  Your motivation, I

11   think you acknowledge it, and as asserted by Attorney Brown,

12   appears to be a request for help, borne perhaps of a fear

13   that once your supervision ended you would be left on your

14   own to fend for yourself.  I think you said as much.

15          And that consequence, to me -- it occurred to me

16   that that might have been very reminiscent of your freshman

17   year in high school when your mother died and you were,

18   frankly, left to fend for yourself.  But that you would

19   choose this course of conduct to stave off that fear, or that

20   scenario, is inexplicable.  And that sort of leads me to the

21   aggravating factors.

22          There is little dispute that these crimes were

23   exceptionally serious, and for multiple reasons.  First, is

24   the extreme nature of the violence threatened -- death by

25   explosives, death by shooting, death by anthrax.  Also, the

1  threats were, in some circumstances, very personal.  The

2  language was vile.  And some even hatred, based on race or

3  religion.  In some instances, the threats involved horrific

4  acts of violence to a recipient's young family members.  If

5  the goal was to get the authorities' attention, and as you

6  put it, to get locked up, none of this was necessary.  I

7  think you acknowledged that, as well.  The Court sees this as

8  gratuitous cruelty.

9         Next, these offenses took planning.  This was not

10  done on the spur of the moment.  You would have had to locate

11  the addresses, physical or e-mail, of your intended victims;

12  drafted the communications specific to that victim.  You

13  chose to identify yourself, in some instances, in a fashion

14  which have fueled the fear of the recipient, using monikers

15  like the Knights of Anarchy or Ted Cowell.

16         And, lastly, it's the victim impact.  The recipients

17  of these communications were terrorized.  First responders

18  were called to multiple scenes.  Businesses, government

19  buildings and healthcare centers were evacuated and their

20  operations disrupted.  People were forced to undergo

21  decontamination protocols.  And, lastly, the sheer volume of

22  the communication as to the seriousness of the offense

23  conduct.

24         All of this, Mr. Gravelle, implicates the various

25  goals of sentencing.  Specific deterrence is prominently

1   implicated here.  You received a 70-month sentence for the

2   exact same conduct in 2010.  And the series of events here

3   are, arguably, an escalation in the severity of the conduct

4   at issue.  General deterrence and promoting respect for the

5   law counsel a significant period of incarceration.

6   Protecting the community from future conduct of this sort is

7   perhaps paramount.

8           While I accept that you had neither the intention,

9   nor, arguably, the means to carry out any of these threats,

10  the victims did not know that.  And make no mistake about it,

11  these recipients were victimized in every sense of the word.

12          I take hope from your statement here, Mr. Gravelle.

13  It is insightful that you are able to see yourself as a

14  different person from the person who was previously

15  sentenced.  It is insightful that you recognize that you did

16  not take the necessary steps to change the trajectory of your

17  life when you were previously incarcerated and maybe even

18  while you were on supervised release.  I take you at your

19  word, and I have no reason to question the sincerity of

20  either your insights or your hopes for yourself in the

21  future.

22          At this juncture, I should indicate I recognize I

23  have the discretion to depart from the applicable Guideline

24  range, pursuant to either Section 5H1.3, which takes into

25  consideration Mr. Gravelle's significant mental and emotional

1    health issues, or Section 5K2.13, which takes into

2    consideration the argument that Mr. Gravelle may have been

3    operating with some form of diminished capacity.  But on the

4    entirety of this record and for the reasons I just addressed

5    a moment ago, I'm not going to exercise that discretion.

6          I also recognize that I have the discretion to

7    depart upward, pursuant to 5K2.7, given the extraordinary

8    level of disruption to Government functioning as a result of

9    the threats made to not only the Probation Office, but a

10   United States District Judge, the sending of purported

11   anthrax and the necessary response to those communications.

12         But, again, I am not going to exercise that

13   discretion.  Frankly, these competing bases for departure

14   make the advisory range, in the Court's view, all the more

15   reasonable.  And when I say "the advisory range," I mean the

16   range I have already departed to, and nor, in considering the

17   statutory factors identified in Section 3553(a) do I believe

18   that the variance either above or below the advisory

19   Guideline range is appropriate for any of the reasons

20   advocated.

21         To be sure, I feel great sympathy for you,

22   Mr. Gravelle, because your life has been a constant challenge

23   from a very young age.  And I hope you are able to make

24   progress in your treatment while with the Bureau of Prisons.

25   But mostly what I hope is that you never, ever engage in this

1    kind of conduct again for any reason; and that if you need
2    help, you simply ask for it.
3            For the reasons I've identified, it is my intention
4    to sentence the Defendant as follows:
5            On Counts One, Two, Five, Six and Ten, the Court
6    intends to sentence you to a period of incarceration of 86
7    months, followed by a period of supervised release of three
8    years, and a special assessment of $100.
9            On Count 13 and Count 16, it is the Court's
10   intention to sentence you to a period of incarceration of 60
11   months followed by a three-year period of supervised release,
12   and a special assessment of $100.
13           Those sentences to run concurrent to the sentence
14   imposed on Counts One, Two, Five, Six and Ten.
15           I should be clear that the sentence on Counts One,
16   Two, Five, Six and Ten, each sentence is 86 months.  Those
17   sentences to run concurrent to each other.  Count 13 and 16
18   of 60 months each to run concurrent to the sentence imposed
19   in Counts One, Two, Five, Six and Ten.
20           So, the total effective sentence in docket ending
21   126 is 86 months of incarceration, three years of supervised
22   release, and a $700 special assessment.
23           In Docket Number 3:10-CR-206, with respect to
24   violation of supervised release, the Court revokes supervised
25   release and sentences you to a period of incarceration of 24

1   months.  This sentence to run consecutive to the sentence

2   imposed in docket ending 126.

3       The total effective sentence for both cases is,

4   therefore, 110 months' incarceration, three years of

5   supervised release, and a $700 special assessment.

6       The Court finds that it has not been presented with

7   a request for restitution, and therefore, no restitution is

8   ordered.  It would not be my intention to order you to pay a

9   fine or the costs of imprisonment because your financial

10  status is such that you are unable to pay a fine or these

11  costs, and that's not likely to change in the immediate

12  future.

13      In terms of supervised release, the Court would

14  impose all the standard conditions and would impose the

15  following mandatory conditions:

16      That you not commit another federal, state or local

17  offense; that you not unlawfully possess a controlled

18  substance; that you refrain from any unlawful use of

19  controlled substances, and submit to one drug test within 15

20  days of release on supervised release and at least two

21  periodic drug tests thereafter for use of a controlled

22  substance.

23      You shall cooperate, if it has not already occurred,

24  in the collection of a DNA sample.

25      In addition to these mandatory conditions, the Court

1    would impose the following special conditions:

2           You must refrain from any and all contact with the

3    victims in the instant offense, and that includes the victims

4    of the counts to which you pled guilty and the counts

5    which the Government will dismiss.

6           You must participate in a program recommended by the

7    Probation Office and approved by the Court for mental health

8    treatment.  You must follow the rules and regulations of that

9    program.  The probation officer, in consultation with the

10   treatment provider, will supervise your participation in the

11   program.  You must pay all or a portion of the costs

12   associated with the treatment, but, of course, subject to

13   your ability to pay those costs.

14          You must subject your person, residence, office or

15   vehicle to a search conducted by a United States Probation

16   Officer at a reasonable time and in a reasonable manner,

17   based upon reasonable suspicion of contraband or evidence of

18   a violation of a condition of release.  Failure to submit to

19   a search may be grounds for revocation.  You must inform any

20   other residents with whom you share a premises that you are

21   subject to this search condition.

22          Before I take up questions as to recommendations for

23   the Bureau of Prisons, let me ask counsel:  Are you aware of

24   any reason why I cannot legally impose the sentence I just

25   outlined?

1      MR. JONGBLOED:  From the Government, no, Your

2  Honor.

3      MR. BROWN:  No, Your Honor.

4      THE COURT:  Okay.

5      MR. JONGBLOED:  Your Honor, can I just make -- just

6  so the record is absolutely clear.  In terms of

7  the supervised release, the 24 months, that's -- you're not

8  reimposing another term of supervised release?  That's ended?

9      THE COURT:  I am not.  I am going to revoke and do

10 24 months.  There will not be an additional period of

11 supervised release in the 2010 docket number.  All supervised

12 release orders in each count are to run concurrent to each

13 other for a total period of supervised release of three

14 years.

15     MR. JONGBLOED:  In the '19 case.

16     THE COURT:  In the 19-CR-126.

17     MR. JONGBLOED:  Yes, Your Honor.  Thank you.

18     THE COURT:  And, Mr. Brown, you said no?

19     MR. BROWN:  No, Your Honor.  No, I have no -- no

20 objections.

21     THE COURT:  Okay.

22     MR. BROWN:  I mean, other than -- whoa (tips in

23 chair.)

24     THE COURT:  Careful.

25     MR. BROWN:  Nothing -- no legal objections.

1          THE COURT:  Okay.  All right.

2          So, Mr. Gravelle, the sentence I just outlined is

3     the sentence of the Court in this case.  It will be my

4     intention to recommend to the Bureau of Prisons -- you know,

5     I don't know if I can use bold to do it as strongly as

6     possible -- that you be designated to -- is it Fort Devens?

7          MR. BROWN:  I mean, it was Fort Devens a long time

8     ago when I was in the Army, but I think it's just --

9          THE DEFENDANT:  It's FMC Devens now.

10          MR. BROWN:  FMC Devens.

11          THE COURT:  FMC Devens.  Thank you.  All right.

12     Then I will request designation to FMC Devens.  If for any

13     reason that's not available, I will ask for the nearest

14     available medical facility with a mental health unit, and I

15     will hope that with the records they receive, which,

16     presumably, will include the competency evaluation and some

17     others, that will inform their decisions, and Mr. Gravelle

18     will be in a position to receive the care that he needs.

19          Are there any other requests for recommendations?

20          MR. BROWN:  No, Your Honor.

21          THE COURT:  Let me -- I think I'm going to make some

22     recommendations to you, Mr. Gravelle, in terms of your time

23     with the BOP.  Obviously, if you're in a medical facility and

24     you're receiving mental health treatment, that is paramount.

25     If for any reason you are not, I would strongly recommend to

1    you the Resolve program.  It's a cognitive behavioral

2    program, and while it may not be (indiscernible -

3    videoconference feed disruption) it can be of assistance.

4            (Reporter interruption.)

5            THE COURT:  While it may not be the best substitute

6    for the mental health treatment that you are seeking, I think

7    it can be helpful.

8            There is also a program called the Mental Health

9    Stepdown Unit Program.  And that is a residential program.  I

10   do not believe it's available at Devens.  It is available at

11   Allenwood.  Obviously, the BOP is going to have all of your

12   records, and they may decide that that's an appropriate

13   program for you.

14           All right.  Shortly, the judgment will enter.  And

15   when that happens, the clock begins ticking on the time to

16   file a Notice of Appeal and to file an appeal of the

17   judgment.  You have 14 days from the entry of judgment to

18   file a Notice of Appeal.  If you wish to appeal, but cannot

19   afford to do so, you can file a motion to proceed *in forma*

20   *pauperis*.  If that motion is granted, the Court will waive

21   the filing fee for your appeal and will appoint a lawyer to

22   handle your appeal at no cost to you.

23           Do you understand this deadline and this right?

24           THE DEFENDANT:  Yes, Your Honor.

25           THE COURT:  Okay.  And let me ask the Government,

1     are they -- is there a motion with respect to remaining

2     counts?

3             MR. JONGBLOED:  Yes, Your Honor.  Pursuant to the

4     plea agreement, the Government asks that all remaining counts

5     in the Indictment be dismissed.

6             THE COURT:  All right.  That motion is granted.

7             MR. JONGBLOED:  Your Honor considered that conduct

8     in fashioning today's sentence.

9             THE COURT:  I did.

10            All right.  Is there anything further we can do this

11    afternoon?  From the Government.

12            MR. JONGBLOED:  No, Your Honor, nothing further from

13    the Government.  Thank you very much.

14            THE COURT:  All right.  Attorney Brown.

15            MR. BROWN:  No, Judge.  Thank you, Your Honor.

16            THE COURT:  All right.  Mr. Gravelle, good luck to

17    you, sir.

18            THE DEFENDANT:  Thank you, Your Honor.

19            THE COURT:  All right.  We are in recess.

20            (Proceedings concluded, 3:23 p.m.)

21

22

23

24

25

1                       C E R T I F I C A T E

2                             IN RE:

3          *U.S. v. GARY JOSEPH GRAVELLE (3:19-cr-00126-KAD)*

4              *U.S. v. ROLAND PREJEAN (3:10-cr-00206-KAD)*

5

6          I, Tracy L. Gow, RPR, Official Court Reporter for the

7     United States District Court, District of Connecticut, do

8     hereby certify that the foregoing pages, 1 through 51, are a

9     true and accurate transcription of my shorthand notes taken

10    in the aforementioned matter(s) to the best of my skill and

11    ability.

12

13                         /s/   TRACY L. GOW
                           Official Court Reporter
14                         U.S. District Court
                           915 Lafayette Boulevard, Room 216
15                         Bridgeport, Connecticut 06604
                           (203) 910-0323
16

17

18

19

20

21

22

23

24

25